**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| G.P., an individual, | Case No. 22-cv-2682 |
| Plaintiff, | |
| | **JUDGE** _____ |
| v. | Related Cases: No. 19-cv-849 |
| | No. 21-cv-5022 |
| WYNDHAM HOTEL & RESORTS, INC., | No. 21-cv-4933 |
| AND RED ROOF INNS, INC. | No. 21-cv-4934 |
| | No. 21-cv-4935 |
| Defendants. | No. 22-cv-1924 |
| | **DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW, the Plaintiff G.P. ("Plaintiff" or "G.P."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.      Human sex trafficking is a form of modern-day slavery that exists illegally throughout the United States and globally and is furthered by public lodging establishments.

2.      For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Criminals paraded their misconduct openly on hotel properties while hospitality giants pay only lip service to campaigns against sex trafficking, standing by to collect profits from traffickers and their clientele at the expense of human life, human rights, and human dignity.

3.      The prevalence of this crime at hotels and motels is due to many factors, including but not limited to, ease of access for buyers, the ability to pay in cash (non-traceability), the ability to maintain anonymity, privacy, discretion, and permission.

1

4.     Defendants Wyndham Hotel & Resorts, Inc. ("Wyndham") and Red Roof Inns, Inc. ("Red Roof") (collectively "Defendants") knew and have known for decades that sex trafficking repeatedly occurs under their brand flags.

5.     Rather than taking timely and effective measures to thwart this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

6.     Plaintiff G.P. is just one of the estimated 40 million victims of human trafficking worldwide.[1] The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[2] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from sexual slavery as traffickers and "johns" rent rooms where victims are sexually exploited night after night, while brands, property management, and staff look the other way. This mutually beneficial relationship fuels the epidemic, allowing traffickers and the hospitality industry to reap the benefits at the expense of victims' lives and dignity.

7.     Plaintiff, G.P., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the federal civil remedy under 18 U.S.C. § 1595. Each Defendant, knowingly benefitted from participation in a commercial business venture that it knew or should have known to be engaging in sex trafficking acts in violation of 18 U.S.C. § 1591(a).

8.     Defendants' decision to prioritize profits over protecting sex trafficking victims results in the repeated exploitation of countless victims like G.P. on their properties. G.P.'s

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.
[2] *Id.*

2

traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

9.      The American Hotel Industry's apathy towards human trafficking has allowed human trafficking in the United States to flourish. Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' hotels worldwide and at their own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris project created for the use of the hospitality industry.

10.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite:   continuing with business as usual, so that Defendants and all industry participants continue to profit from human trafficking.

## PARTIES

11.     Plaintiff G.P. is a natural person and a resident and citizen of Cincinnati, Ohio.

12.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

            a.      Due to the sensitive and intimate nature of the issues, Plaintiff G.P. requests
                    that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to
                    permit her to proceed under a pseudonym and to ensure that Defendants

3

maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[3]

b.   Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[4] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[5] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[6]

c.   Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.   Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[7]

---

[3] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[4] Fed. R. Civ. P. 10(a).

[5] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[6] Fed. R. Civ. P. 26(c).

[7] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

13. **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. It is a Delaware corporation with its principal place of business in Parsippany, NJ and can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

14. Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

15. Wyndham owns, supervises, manages, controls, and/operates the Super 8 located at 330 Glensprings Dr., Cincinnati, Ohio 45246, and the Travelodge on both 11171 Dowlin Dr, Cincinnati, Ohio 45241 and 3244 Central Pkwy, Cincinnati, Ohio 45225 ("Cincinnati Super 8 and Travelodge").

a. Super 8 and Travelodge by Wyndham are a Wyndham Hotel & Resorts, Inc. brand property.[8]

---

[8] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15, 2022).

b. Defendant Wyndham is the principal in an agency relationship with the Cincinnati Super 8 and Travelodge. It is both directly and vicariously liable for the acts and/or omissions of the staff at its branded hotels, including the Cincinnati Super 8 and Travelodge where G.P. was trafficked. The Cincinnati Super 8 and Travelodge also has apparent agency for Wyndham so as to establish vicarious liability, in addition to an actual agency relationship.

c. Wyndham ratified the actions and inactions of the Cincinnati Super 8 and Travelodge.

d. Wyndham knowingly benefited, or received something of value, from its commercial business venture at the Cincinnati Super 8 and Travelodge through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where G.P. was trafficked, as well as in maintaining a positive public image for the Super 8 and Travelodge brand.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Cincinnati Super 8 and Travelodge, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio, has caused injuries to G.P. in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell G.P. for commercial sex at the Cincinnati Super 8 and Travelodge in Ohio.

6

16.     **Defendant Red Roof Inns, Inc.** ("Red Roof") is a global hotel brand with approximately 650 branded properties worldwide. It is an Ohio corporation with its principal place of business in New Albany, Ohio and can be served through its registered agent, Corporation Service Company, at 50 W. Broad Street, Suite 1330, Columbus, OH 43215.

17.     Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn® 2301 E Sharon Rd., Sharonville, Ohio 45241.

   a.  Red Roof owns and controls the Red Roof Inn brand, and the Sharonville Red Roof Inn is a Red Roof brand property.[9]

   b.  Red Roof is the principal in an agency relationship with the Sharonville Red Roof Inn.[10] It is both directly and vicariously liable for the acts and/or omissions of the staff at its brand hotels, including the Sharonville Red Roof Inn where G.P. was trafficked. The Sharonville Red Roof Inn also has apparent agency for Red Roof so as to establish vicarious liability, in addition to an actual agency relationship.

   c.  Red Roof ratified the actions and inactions of Sharonville Red Roof Inn.

   d.  Red Roof knowingly benefited, or received something of value, from its commercial business venture at the Sharonville Red Roof Inn through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms

---

[9] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).
[10] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

where G.P. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn brand.

e. Red Roof is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio such as the Sharonville Red Roof Inn, contracting to supply services in Ohio, and deriving substantial revenue from services rendered in Ohio, has caused indivisible injuries to G.P. in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell G.P. for commercial sex at the Sharonville Red Roof Inn in Ohio.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this District and a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

20. Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, and 2:2021-cv-05022 currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

### INTRODUCTION

21. This case brings claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

Case: 2:22-cv-02682-ALM-EPD  Doc #: 1  Filed: 07/02/22  Page: 9 of 27  PAGEID #: 9

22.     Defendants are complicit in the world's fastest growing crime.[11]

23.     The TVPRA prohibits Defendants from engaging in any venture they know or should know involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in what they know or should know involves a trafficking venture.

24.     The hospitality industry and Defendants' Brand hotels are at the center of the sex trafficking trade. Countless research, news, and nonprofits have confirmed the "obvious nexus" between human trafficking and hotels crucial role as the venue for selling commercial sex.[12]

25.     An overwhelming majority of commercial sex trafficking transactions occur within the hospitality industry as traffickers use hotels as the hub of their operations.[13] Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

26.     In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[14]

27.     A recent survey of survivors who called the National Human Trafficking Hotline found 60% had been forced to engage in commercial sex within the confines of a hotel or motel

---

[11] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[12] Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS https://polarisproject.org/hotels-motels-recommendations; Giovanna L. C. Cavagnaro*, Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/ honorstheses/3.
[13] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754 .
[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

9

during their trafficking, and 75% had stayed in a hotel or motel during travel or otherwise directly encountered a hotel or motel at some point during their trafficking.[15]

28.     Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and, in particular, sex trafficking. In addition, "buyers" purchasing people for sex, typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

29.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally refusal to adopt and enforce company-wide anti-trafficking policies, train staff on what to look for and how to respond, failed to conduct audits confirming that training had been implemented and that human trafficking occurrences were being prevented on hotel properties and/or establish safe and secure reporting mechanisms for those at the point of sale. Defendants further failed to enact robust policies and practices to ensure continuous, directed action to combat human trafficking on their properties. As a result, the sex trade continues to thrive at Defendants' branded properties, and everyday victims of human trafficking like G.P. are repeatedly exploited within the rooms of Defendants branded properties across the country.

30.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

31.     Plaintiff's injuries are indivisible.

32.     The TVPRA provides for joint and several liability.

**THE SEX TRAFFICKING OF PLAINITFF G.P.**

33.     G.P. first met her traffickers in 2013, when she was 30 years old.

---

[15] *On-Ramps, Intersections, and Exit Routes,* POLARIS (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf.

34. By means of a combination of violence, threats, illegal substances, and dependence on basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing. G.P. was held captive and sold for sex by her traffickers approximately from 2013 to 2016.

35. During the time that she was trafficked, G.P.'s traffickers frequently rented rooms at the Defendants' hotel locations because such rooms provided convenient, anonymous, and relatively central locations to which they could invite "johns" for the purpose of forcing G.P. to have sex with those "johns" for money.

36. Throughout her trafficking, G.P.'s traffickers connected with "johns" willing to abuse G.P. for money by posting or causing to be posted entries on Backpage, Craigslist, USA Sex Guides advertising for G.P.'s availability for commercial sex.

37. Day after day, G.P. was sold and forced to perform sexual acts with multiple "johns" in a single night until she made her trafficker's quota of $350.00 to $500.00 a night.

38. Over the course of a grueling three (3) years, while under the coercive control of traffickers and "johns", G.P.'s traffickers rented rooms at, and forced her to have sex for money within, at least the following hotels:

    a. Super 8 by Wyndham at 330 Glensprings Dr., Cincinnati, Ohio 45246;

    b. Travelodge by Wyndham at 11171 Dowlin Dr, Cincinnati, Ohio 45241;

    c. Travelodge by Wyndham at 3244 Central Pkwy, Cincinnati, Ohio 45225; and

    d. Red Roof Inn by Red Roof at 2301 E Sharon Rd., Sharonville, Ohio 45241;

39. During the time she was trafficked, G.P.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals, including the hotels listed above.

40.     While at the Defendants' hotels, G.P.'s traffickers administered physical violence and withheld food and water to ensure that she could not escape.

41.     During her captivity at Defendants' hotels, including the above listed locations, G.P. was subjected to rape, frequent physical and verbal abuse, malnourishment, psychological torment, kidnapping, and false imprisonment permitted by Defendants' brand hotel employees and managers.

42.     At the above listed hotels, G.P. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of G.P.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties.

43.     Traffickers of G.P. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of G.P.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF G.P. AT THE SUPER 8 BY WYNDHAM**

44.     In 2013, Plaintiff G.P. was subjected to sex trafficking at the Wyndham branded, Super 8 hotel located at 330 Glensprings Dr., Cincinnati, OH 45246, when she was 30 years old.

45.     For approximately a year, Plaintiff's traffickers rotated days at a time at this location, encountering the same staff. Plaintiff was one of many females being trafficked by her traffickers. Housekeeping would always complain to G.P. and the other females about cleaning their room given the numerous guys coming in and out of their room. Accordingly, the traffic and parade of men coming in and out of the Super 8 was obvious and noticeable.

46.     Further, with each stay at the Super 8 by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a

12

day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s room; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; and Loud noises of abuse or other violence audible to staff and/or other rooms.

47.    Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Super 8 hotel.

48.    These red flags were open and obvious to anyone working at the Super 8 by Wyndham and lasted continuously for a year.

**THE SEX TRAFFICKING OF G.P. AT THE DOWLIN TRAVELODGE BY WYNDHAM**

49.    Starting in 2013, Plaintiff G.P. was subjected to sex trafficking at the Wyndham branded, Travelodge located at 11171 Dowlin Dr., Cincinnati, OH 45241 when she was 30 years old.

50.    For approximately two (2) years, Plaintiff's traffickers rotated days at a time at this location, encountering the same staff. Plaintiff was one of many girls that were being simultaneously trafficked in this hotel.

51.    With each stay at this Travelodge by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and

out of G.P.'s room; Loud noises of abuse or other violence audible to staff or other rooms; and Asking the front desk not to be disturbed.

52.     A Travelodge employee who worked the front desk was involved in the sex trafficking operation to the extent that they were familiar with the traffickers and allowed them to stay with only cash and no identification on record. They also served as lookouts for police.

53.     There would be constant fighting and yelling between one of the other girls and the traffickers coming from the room at the Travelodge. Police were called to this location numerous times because of the noise complaints and still nothing was done by Defendant to stop the traffickers.

54.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Travelodge hotel by Wyndham.

55.     These red flags were open and obvious to anyone working at the Travelodge hotel by Wyndham and lasted continuously for two years.

**THE SEX TRAFFICKING OF G.P. AT THE CENTRAL TRAVELODGE BY WYNDHAM**

56.     Starting in 2013, Plaintiff G.P. was subjected to sex trafficking at the Wyndham branded, Travelodge located at 3244 Central Pkwy, Cincinnati, Ohio 45225 when she was 30 years old.

57.     For approximately two (2) years, Plaintiff's traffickers rotated days at a time every month at this hotel. This hotel was Plaintiff's traffickers "go-to hotel" because the hotel staff did not care what was occurring on the property.

58.     With each stay at this Travelodge by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually

14

large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s room; Loud noises of abuse or other violence audible to staff or other rooms and Asking the front desk not to be disturbed.

59.     The Travelodge front desk employees knew the Plaintiff's traffickers and allowed them stay with only cash and no identification on record. Housekeeping would complain about the numerous needles and drug paraphernalia in the rooms, but the front desk told housekeeping it was not an issue for them and to keep their business.

60.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at this Travelodge hotel by Wyndham.

61.     These red flags were open and obvious to anyone working at this Travelodge hotel by Wyndham and lasted continuously for two years.

**THE SEX TRAFFICKING OF G.P. AT RED ROOF BY RED ROOF INN**

62.     In 2014, Plaintiff G.P. was subjected to sex trafficking at the Red Roof Inn branded Red Roof located at 2301 E Sharon Rd., Sharonville, Ohio 45241.

63.     For approximately four months Plaintiff's traffickers rotated days at a time at this location, encountering the same staff.

64.     With each stay at this Red Roof, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s

15

room; Loud noises of abuse or other violence audible to staff or other rooms; and Asking the front desk not to be disturbed.

65.     G.P.'s traffickers got into numerous arguments with "johns" at this location about prices. A noise complaint was filed that indicated there was loud fighting and arguing coming from the room.

66.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Red Roof by Red Roof Inn.

67.     These red flags would have been open and obvious to anyone working at the Red Roof by Red Roof Inn and lasted continuously for approximately four months.

68.     Despite the abundance of available evidence of G.P.'s captivity and abuse, G.P. received no assistance from any employee of the Defendant's hotel, and Defendant continued to repeatedly rent rooms to her traffickers.

69.     The impact of being beaten, threatened, exploited, raped, sex trafficked, and ignored at Defendant's hotel property has forever emotionally and physically injured G.P., who, despite the years since her escape, suffers immensely as a result of the horrors inflicted upon her at Defendant's hotel.

70.     Had Defendant not hewed to a common policy of harboring known and suspected human traffickers in exchange for their benefit, G.P.'s traffickers could not have successfully arranged the commercial sex transactions that were the reason underlying G.P.'s continued captivity.

71.     Had Defendant not hewed to a common policy of actively ignoring signs of ongoing human trafficking, the open and obvious signs of G.P.'s sex trafficking would likely have resulted in far earlier reporting of her traffickers and thus in a far earlier end to her victimization.

72.     G.P.'s injuries are thus the direct and proximate result of the Defendant's maintenance of policies and procedures that they knew or should have known incentivized their employees to ignore the obvious signs of human trafficking, and even rent rooms to known or suspected human traffickers, while they continued to profit from sex trafficking.

**BRAND HOTEL DEFENDANTS' CONTROL OVER THEIR HOTEL LOCATIONS**

73.     Upon information and belief, it is standard practice in the hospitality industry, followed by all Hotel Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served to the number of pillows that shall be placed on each bed, types of funds accepted, and when, where, and how guests should be greeted.

74.     The Hotel Defendants provide to their branded properties signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

75.     Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants.

76.     Upon information and belief, per the relevant franchise agreements, the Hotel Defendants may enforce their brand standards by means of periodic inspections of hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

77.     Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

78.     It is further a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

79.     The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, the Hotel Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

80.     On information and belief, the Hotel Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

81.     Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked.

82.     Specifically, the Hotel Defendants control the creation and promulgation of policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether such training shall be mandatory.

83.     Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

84. On information and belief, the Hotel Defendants require their hotel locations to pay approximately 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

**HOTEL DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

85. Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[16] The United Nations,[17] international non-profits,[18] and the U.S. Department of Homeland Security,[19] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

86. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms

---

[16] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[17] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[18] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[19] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

87.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[20] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[21] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

88.     The Hotel Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Hotel Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

89.     The Hotel Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

90.     The Hotel Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently

---

[20] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[21] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

91.     A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Hotel Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**WYNDHAM**

a.  Regarding a stay in April 2013 at the Cincinnati Super 8, a hotel customer wrote a review saying, "You get what you pay for -- The door was ajar when going in..motel was ok some rooms were run down. Bed was stripped down with bed things rolled up and sitting across the tv microwave area. Microwave was broke. Condom wrapper was behind toilet paper roll. Towels were ragged. Frame if bed was plywood. Very seedy hotel. One of those hotels next to a bar and a one-night stand hooker hotel and would not stay there again!!"

b.  Regarding another stay in July 2013 at the Cincinnati Super 8, a hotel customer wrote a review saying, "STAY AWAY! … Room parties, drunk prostitutes were knocking on all doors at 4am, my room lock had to be close to broken to get in the room, there was a personal door alarm someone installed, drug residue in the Bible drawer, room was filthy (I wouldn't even use the restroom)…"

**RED ROOF**

    a.  Regarding a stay in January 2016 at the Sharonville Red Roof, a hotel customer wrote a review saying, "If you plan to sleep here, don't count on it. There are prostitutes, drug dealers and partiers who stay up all night and party outside their rooms. . . Don't plan to sleep in either because the housekeeping carts squeak like crazy and the housekeeping staff shout at each other at 8:00 a.m. If not them, it's the guests who do not realize that people might be sleeping."

    b.  Regarding a stay in February 2019 at the Sharonville Red Roof, a hotel customer wrote a review saying, "Management knows prostitutes play, lay, and stay. Heroin needles. Dogs without lease. Oh, don't disagree or you won't be able to visit Mean Joe's traphouse anymore. Worst Red Roof inn to visit and or stay unless you're in active addiction."

## DEFENDANTS FACILITATED THE TRAFFICKING OF G.P.

92.    Each Defendant is a signatory of the Code[22] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all of these policies.

93.    Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective

---

[22] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

Brand standards for implementation, mandates, and operations, but also enforced them.

94.     Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

95.     Defendants profited from the sex trafficking of Plaintiff G.P. Defendants rented rooms to G.P.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where G.P. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of G.P.'s trafficking.

96.     Defendants benefited from the steady stream of income that G.P.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that G.P.'s traffickers and customers rented.

97.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of human trafficking occurring at the locations where G.P. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

98.     Moreover, Defendants repeatedly collected data on G.P., her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of G.P.'s trafficking including signs of abuse,

frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop sex trafficking from occurring in their hotels. If Defendants would have taken proper measures, G.P. and other victims like her, would not have been trafficked at their locations.

99.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

24

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

100. As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, G.P. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSE OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

101. Plaintiff incorporates each foregoing allegation.

102. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

103. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

104.    Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

105.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.   Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.


Dated: July 2, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com
