**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| G.P., an individual, <br><br> Plaintiff, <br><br> v. <br><br> **WYNDHAM HOTEL & RESORTS, INC.;** <br> **SUPER 8 WORLDWIDE, INC.;** <br> **TRAVELODGE HOTELS, INC.;** <br> **RED ROOF INNS, INC.; AND** <br> **RED ROOF FRANCHISING, LLC.** <br><br><br> Defendants. | Case No. 22-cv-2682 <br><br> Hon. Algenon L. Marbley <br> Mag. Judge Deavers <br><br> **DEMAND FOR JURY TRIAL** |

**SECOND AMENDED COMPLAINT**

COMES NOW, the Plaintiff G.P. ("Plaintiff" or "G.P."), by and through her undersigned counsel, and respectfully submits her Second Amended Complaint for damages and makes the following averments.

**INTRODUCTION**

1.  Plaintiff G.P. is a survivor of human sex trafficking.

2.  G.P.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.  G.P. met people that groomed her into trafficking. Ultimately those people —her traffickers—came to control every aspect of her life. The defining factor of the relationship between G.P. and her traffickers, was that each night, G.P.'s traffickers forced her to have sex with men for money.

4.      G.P. was trafficked in hotels owned by Defendants[1] Wyndham Hotels & Resorts, Inc.; Super 8 Worldwide, Inc.; Travelodge Hotels, Inc.; Red Roof Inns, Inc.; and Red Roof Franchising, LLC.[2] G.P.'s traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.      At Defendants' hotels, G.P. was forced to engage in sex with many men every day. Every new customer was another instance G.P. was forced to have sex against her will—that is to say, G.P. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6.      G.P.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At some point, G.P. was able to escape the grasps of her traffickers and the prison of Defendants' hotel rooms.

8.      G.P. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.      G.P. brings this lawsuit in an attempt to hold the Defendants that imprisoned her, accountable for their role in her trafficking

## OVERVIEW OF TRAFFICKING

10.     A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Wyndham Hotels & Resorts, Inc.; Super 8 Worldwide, Inc.; Travelodge Hotels, Inc.; Red Roof Inns, Inc.; and Red Roof Franchising, LLC. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.
[2] Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC will be collectively referred to as "Red Roof."

11.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

13.     Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much

---

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

3

public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

16. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

17. Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of G.P. on their properties.

18. G.P., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

19. Plaintiff G.P. is a natural person and a resident and citizen of Cincinnati, Ohio.

20. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

     a. Due to the sensitive and intimate nature of the issues, Plaintiff G.P. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants

maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[4]

b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[6] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[7]

c.    Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.    Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[8]

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e.      Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

21.      **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

22.      Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

23.      Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

24.      Wyndham Hotels provides franchise opportunities for its Travelodge branded hotels through **Defendant Travelodge Hotels, Inc.** ("Travelodge"). It is Delaware corporation with its principal place of business in Parsippany, NJ and it can be served through its registered agent, Corporation Service Company, at Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

25.      Wyndham Hotels provides franchise opportunities for its Super 8 branded hotels through **Defendant Super 8 Worldwide, Inc.** ("Super 8"). It is a North Dakota corporation with its principal place of business in Parsippany, NJ and it can be served through its registered agent,

6

Corporation Service Company, at Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.[9]

26.     Wyndham owns, supervises, manages, controls, and/or operates Super 8 located at 330 Glensprings Dr., Cincinnati, Ohio 45246 ("Glensprings Super 8"); the Travelodge located at 11171 Dowlin Dr, Cincinnati, Ohio 45241 ("Dowlin Travelodge"); and the Travelodge located at 3244 Central Pkwy, Cincinnati, Ohio 45225 ("Central Travelodge") (collectively, the "Wyndham Branded Cincinnati Properties").

        a.   The Glensprings Super 8, Dowlin Travelodge, and Central Travelodge are Wyndham-branded properties.[10]

        b.   Wyndham employees worked throughout the Wyndham Branded Cincinnati Properties. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Wyndham Branded Cincinnati Properties. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including the Wyndham Branded Cincinnati Properties where G.P. was trafficked. Wyndham has an actual and apparent agency relationship with the physical property owners of the Wyndham Branded Cincinnati Properties as to establish vicarious liability.

---

[9] Defendants Wyndham Hotels & Resorts, Inc., Super 8 Worldwide, Inc., and Travelodge Hotels, Inc., are referred to herein as "Wyndham." Under these circumstances, these entities are one and the same for purposes of this lawsuit. Any reference to Wyndham Hotels & Resorts, Inc., Super 8 Worldwide, Inc., and Travelodge Hotels, Inc. is a reference to all the entities.

[10] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

7

c. Wyndham controlled and dictated the actions and inactions of the Wyndham Branded Cincinnati Properties through highly specific and detailed brand standards, policies, and procedures.

d. Wyndham knowingly benefited, or received something of value, from its ventures at the Wyndham Branded Cincinnati Properties through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where G.P. was trafficked, as well as in maintaining a positive public image for the Wyndham Branded Cincinnati Properties. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including G.P. and her traffickers.

e. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio including the Wyndham Branded Cincinnati Properties, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

27.    **Defendant Red Roof Inns, Inc ("RRI").** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC ("RRF")**.[11] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

28.    RRI is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

29.    RRI maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

30.    RRF was named one of the fastest growing franchises in 2017.  It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

31.    RRF maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

32.    Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at Red Roof Inn located at 2301 E Sharon Rd., Sharonville, Ohio 45241 ("Sharon RRI")

    a.  The Sharon RRI by Red Roof is a Red Roof branded property.

    b.  Red Roof employees work throughout the Sharon RRI by Red Roof. Red Roof employees work jobs including front desk and housekeeping. Red Roof

---

[11] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm. Defendants RRI and RRF will be collectively

is the principal with control over nearly every element of operations at the Sharon RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Sharon RRI by Red Roof where G.P. was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Sharon RRI by Red Roof as to establish vicarious liability.

c.  Red Roof controlled and dictated the actions and inactions of the Sharon RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

d.  Red Roof knowingly benefited, or received something of value, from its ventures at the Sharon RRI through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where G.P.. was trafficked, as well as maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including G.P.. and her traffickers.

e.  Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio like the Sharon RRI, contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

10

f.   Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

## JURISDICTION AND VENUE

33.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

34.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this District and a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

35.   Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-02683; 2:2022-cv-02690; 2:2022-cv-02734 2:2022-cv-03185; 2:2022-cv-03202; and 2:2022-cv-03203 currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

### INTRODUCTION

36.   G.P. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

37.   The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

38. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[12] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

39. As part of their conspiracy to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

40. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

41. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like G.P. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

42. Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

43. Defendants are jointly and severally liable for the Plaintiff's damages in this case.

---

[12] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

**THE SEX TRAFFICKING OF PLAINTIFF G.P.**

44.     G.P. met her traffickers when she was seventeen (17) years old.

45.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, G.P. was held captive and sold for sex by her traffickers.

46.     During the time that she was trafficked, G.P.'s traffickers frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with G.P.

47.     Throughout her trafficking, G.P.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage, Craigslist, and USA Sex Guides advertising for G.P.'s availability for commercial sex at Defendant's locations.

48.     G.P. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

49.     While under the coercive control of her trafficker, G.P. was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, G.P. was trafficked in the following hotels:

      a.  Glensprings Super 8 by Wyndham at 330 Glensprings Dr., Cincinnati, Ohio 45246;

      b.  Dowlin Travelodge by Wyndham at 11171 Dowlin Dr, Cincinnati, Ohio 45241;

      c.  Central Travelodge by Wyndham at 3244 Central Pkwy, Cincinnati, Ohio 45225; and

   d.   Sharon RRI by Red Roof at 2301 E Sharon Rd., Sharonville, Ohio 45241.

50.   During the time she was trafficked, G.P.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

51.   While at the Defendants' hotels, G.P.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

52.   During her captivity at Defendants' hotels, G.P. was raped, continuously abused physically and verbally, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

53.   At the above listed hotels, G.P. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of G.P.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse occurring loudly in areas of Defendants' properties.

54.   Every time G.P. interacted with Defendants' staff, it was readily apparent that G.P. was under the control of her trafficker. G.P.'s traffickers.

55.   The traffickers of G.P. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of G.P.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF G.P. AT THE GLENSPRINGS SUPER 8 BY WYNDHAM**

56.   G.P. was subjected to sex trafficking at the Glensprings Super 8 by Wyndham located at 330 Glensprings Dr., Cincinnati, OH 45246.

57.   G.P. and her traffickers stayed at the Glensprings Super 8 by Wyndham from 2013 to 2014, rotating, frequently staying for days at a time, encountering the same staff, within this one-year period.

14

58. G.P. was one of many females being trafficked by her traffickers. During her stays at the Glensprings Super 8 by Wyndham, housekeeping frequently complained to G.P. and the other females about cleaning their room. Housekeeping constantly stated the room was a mess as a result of the many men coming in and out of their room.

59. During her stays at Glensprings Super 8 by Wyndham, several consistent red flags of human trafficking were present, including, but not limited to the following: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Apparent signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s room; Visible signs of physical abuse; Asking the front desk not to be disturbed; and Loud noises of abuse or other violence audible to staff and/or other rooms.

60. Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Glensprings Super 8 by Wyndham.

61. These red flags were open and obvious to anyone working at the Glensprings Super 8 by Wyndham and lasted continuously for a year.

**THE SEX TRAFFICKING OF G.P. AT THE DOWLIN TRAVELODGE BY WYNDHAM**

62. G.P. was subjected to sex trafficking at the Dowlin Travelodge by Wyndham located at 11171 Dowlin Dr., Cincinnati, OH 45241.

63. G.P. and her traffickers stayed at the Dowlin Travelodge by Wyndham from 2013 to 2015, rotating, frequently staying for days at a time, encountering the same staff, within this two-year period.

64. An employee of the Dowlin Travelodge by Wyndham maintained a friendship with G.P.'s traffickers.

65. In addition, a front desk employee at the Dowlin Travelodge by Wyndham, was involved in the sex trafficking operation by notifying G.P.'s traffickers when the police were at the property.

66. G.P.s traffickers paid cash for rooms and showed no identification upon check-in.

67. When G.P. stayed at the Dowlin Travelodge by Wyndham, there was constant fighting and yelling between the traffickers and their victims, including G.P. Police were called to this location numerous times because of the noise complaints. Still, even then, the Dowlin Travelodge by Wyndham continued to benefit from G.P.'s sexual exploitation by allowing for her traffickers to continue to rent rooms and use the hotel's Wi-Fi for advertisements.

68. With each stay at the Dowlin Travelodge by Wyndham, several red flags of human trafficking were present, including, but not limited to the following: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s room; Loud noises of abuse or other violence audible to staff or other rooms; and Asking the front desk not to be disturbed.

69. Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Dowlin Travelodge hotel by Wyndham.

70. These red flags were open and obvious to anyone working at the Dowlin Travelodge hotel by Wyndham and lasted continuously for two years.

**THE SEX TRAFFICKING OF G.P. AT THE CENTRAL TRAVELODGE BY WYNDHAM**

71. G.P. was subjected to sex trafficking at the Central Travelodge by Wyndham located at 3244 Central Pkwy, Cincinnati, Ohio 45225.

16

72.     G.P. and her traffickers stayed at the Central Travelodge by Wyndham from 2013 to 2015, rotating, frequently staying for days at a time, encountering the same staff, within this two-year period.

73.     The Central Travelodge by Wyndham was G.P.'s traffickers' "go-to hotel" because the Wyndham employees had an "anything goes" cavalier attitude.

74.     The Central Travelodge by Wyndham front desk employees knew G.P.'s traffickers, and that G.P.'s traffickers were trafficking G.P. However, the front desk employees allowed them stay and use rooms for trafficking.

75.     At the Central Travelodge by Wyndham room were paid for with only cash and no identification on record. Housekeeping complained about the numerous needles and drug paraphernalia in the rooms, but the front desk told housekeeping it was not an issue and did nothing in order to keep reaping of the benefits from the sale of rooms, thereby allowing for G.P. and her traffickers to return for two years.

76.     With each stay at the Central Travelodge by Wyndham, several red flags of sex trafficking were present, including, but not limited to the following: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Apparent signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s room; Loud noises of abuse or other violence audible to staff or other rooms; and Asking the front desk not to be disturbed.

77.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Central Travelodge by Wyndham.

78. These red flags were open and obvious to anyone working at this Central Travelodge by Wyndham and lasted continuously for two years.

### THE SEX TRAFFICKING OF G.P. AT THE SHARON RRI BY RED ROOF INN

79. G.P. was subjected to sex trafficking at the Sharon RRI by Red Roof located at 2301 E Sharon Rd., Sharonville, Ohio 45241.

80. G.P. and her traffickers stayed at the Sharon RRI by Red Roof during 2014 rotating, staying for days at a time, encountering the same staff, during this year.

81. G.P.'s traffickers got into numerous arguments with "johns" at the Sharon RRI by Red Roof about prices. A noise complaint was filed that indicated there was loud fighting and arguing coming from the room.

82. With each stay at the Sharon RRI by Red Roof, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for G.P. or her traffickers at the front desk; Unusually large number of male visitors going in and out of G.P.'s room; Loud noises of abuse or other violence audible to staff or other rooms; and Asking the front desk not to be disturbed.

83. Plaintiff was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Sharon RRI by Red Roof.

84. These red flags would have been open and obvious to anyone working at the Sharon RRI by Red Roof

### DEFENDANT'S KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

18

85. Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[13] The United Nations,[14] international non-profits,[15] and the U.S. Department of Homeland Security,[16] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

86. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

---

[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[14] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[15] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[16] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

87.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[17] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[18] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

88.     The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human trafficker.

89.     The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

90.     The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

---

[17] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[18] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

91.    A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**WYNDHAM**

a.  Regarding a stay in April 2013 at the Glensprings Super 8 by Wyndham, a hotel customer wrote a review saying, "You get what you pay for -- The door was ajar when going in..motel was ok some rooms were run down. Bed was stripped down with bed things rolled up and sitting across the tv microwave area. Microwave was broke. Condom wrapper was behind toilet paper roll. Towels were ragged. Frame if bed was plywood. Very seedy hotel. One of those hotels next to a bar and a one-night stand hooker hotel and would not stay there again!!"

b.  Regarding another stay in July 2013 at the Glensprings Super 8 by Wyndham, a hotel customer wrote a review saying, "STAY AWAY! … Room parties, drunk prostitutes were knocking on all doors at 4am, my room lock had to be close to broken to get in the room, there was a personal door alarm someone installed, drug residue in the Bible drawer, room was filthy (I wouldn't even use the restroom)…"

**RED ROOF**

a.  Regarding a stay in January 2016 at the Sharon RRI by Red Roof, a hotel customer wrote a review saying, "If you plan to sleep here, don't count on it. There are prostitutes, drug dealers and partiers who stay up all night and party outside their rooms. . . Don't plan to sleep in either because the housekeeping carts squeak like crazy and the housekeeping staff shout at each other at 8:00

21

a.m. If not them, it's the guests who do not realize that people might be sleeping."

b. Regarding a stay in February 2019 at the Sharon RRI by Red Roof, a hotel customer wrote a review saying, "Management knows prostitutes play, lay, and stay. Heroin needles. Dogs without lease. Oh, don't disagree or you won't be able to visit Mean Joe's traphouse anymore. Worst Red Roof inn to visit and or stay unless you're in active addiction."

**DEFENDANTS FACILITATED THE TRAFFICKING OF G.P.**

92. Each Defendant is a signatory of the Code[19] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

93. Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Red Roof publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Red Roof should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

94. Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

---

[19] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

95.     Defendants profited from the sex trafficking of Plaintiff G.P. Defendants rented rooms to and provided Wi-Fi to G.P.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where G.P. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of G.P.'s trafficking.

96.     Defendants benefited from the steady stream of income that G.P.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that G.P.'s traffickers and customers rented where G.P. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time G.P.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit G.P. for commercial sex.

97.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where G.P. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

98.     Moreover, Defendants repeatedly collected data on G.P., her traffickers, and "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of G.P.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking from occurring in their hotels. If

Defendants would have taken proper measures, Defendants would not have profited from G.P. and other victims like her being trafficked at their locations.

99. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where G.P. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

100. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where G.P. was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

101. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems. These systems, which Defendants required its branded properties to use, were defective in ensuring customer safety and, specifically, identifying and mitigating suspected and actual incidents of human trafficking on Defendants' properties.

102. A reasonably diligent hotel brand in the Defendants' position would have included policies and procedures to identify and mitigate guest safety issues related to human trafficking in its franchise agreements, brand standards, and systems standards. Upon information and belief,

24

Defendants' branded properties would have expected this material to be included in Defendants' policies and procedures. By failing to include such policies and procedures, Defendants led the branded properties to be negligently managed.

103.    Instead, Defendants negligently required the branded properties to adopt injurious procedures that allowed trafficking to continue and thrive at Defendants' properties, such as failing to accurately identify customer complaints that raise red flags of trafficking and take meaningful steps to address them. Defendants provided and operated defective systems for daily property operations, management, policies, procedures, and training that were incapable of determine whether they were generating revenue as a result of renting rooms where victims of trafficking were harbored and sold for commercial sex.

104.    Defendants voluntarily undertook and assumed a duty to protect the safety of guests at the branded property where Plaintiff was trafficked, such as security, criminal activity, food safety, emergency response protocols, and fire equipment, among others.

105.    Defendants did not exercise reasonable due diligence and care in selecting franchisees to operate its branded properties. Defendants failed to conduct background checks and additional investigations to identify customer safety and security risks. Defendants failed to conduct investigations such as background checks background and additional due diligence to identify whether they sold and licensed their systems and brands to a company able to secure customer safety and security risks.

106.    Defendants negligently designed the layout and structure of the franchised unit or approved the layout and design of the interior or exterior of the hotel property so that red flags of human trafficking were hidden.

107.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

    a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

    d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

    f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

    g.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their

properties.

108.    As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, G.P. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

### DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

109.    In the hotel industry, Defendants are major hotel corporations that hold, own, manage, and operate trademarks, licenses, and standard operating systems for hotel brands. As parent companies with decades of expertise in the hotel industry, Defendants provide property owners with standard operating systems that control the daily operations and management of Defendants' branded properties.

110.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

111.    Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

112.    Defendants provide their branded properties brand name recognition, marketing, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers,

27

revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Defendants.[20] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[21]

113.    Defendants require their branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, processing credit card transactions, internet and technology, and guest safety.

114.    Essentially, Defendants provide a hotel in a box. Branded property owners only provide the physical property, while Defendants provide everything else required to operate and manage the hotel down to the minute details of daily operation. Branded properties must follow Defendants' strict standards to receive the right to operate one of Defendants' brands.

115.    Per the relevant franchise agreements,[22] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations to monitor compliance. If Defendants' branded properties fail to comply with Defendants' standards,  Defendants penalize properties with fees and the ultimate threat of termination of the franchise agreement.

**WYNDHAM**

116.    Wyndham exercises day-to-day control over the Wyndham Branded Cincinnati Properties and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over the Wyndham Branded Cincinnati Properties where G.P. was trafficked, as either direct

---

[20] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.

[21] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[22] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

subsidiaries or under the terms of its franchise agreements.

117. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use Wyndham's property management system;

b. Requiring branded locations to keep audit reports and other records;

c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f. Providing marketing requirements and standardized marketing services for the branded locations;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties

upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m. Insurance coverage requirements. [23]

118. Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham. [24]

119. Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels. [25]

120. Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Wyndham Branded Cincinnati Properties where G.P. was trafficked. [26]

121. Wyndham mandates branded properties source through Wyndham's global

---

[23] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf

[24] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).

[25] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).

[26] *Id.*

distribution system.[27] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Wyndham Branded Cincinnati Properties where G.P. was trafficked.[28]

122.    Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[29]

123.    Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[30] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[31]

124.    Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Wyndham Branded Cincinnati Properties where G.P. was trafficked.[32]

125.    Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[33] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[34] In addition, Wyndham sets forth policies

---

[27] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

[28] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[29] Id.

[30] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

[31] *Supra* n 103

[32] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

[33] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)

[34] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)

for, and provides employee benefits. [35]

126.     Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement. [36]

**RED ROOF**

127.     Red Roof exercises day-to-day control over the Sharon RRI by Red Roof and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Sharon RRI by Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

128.     Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

    b.  Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c.  Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    d.  Providing and controlling customer review and response platforms;

---

[35] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)

[36] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

     e. Hosting online bookings on Red Roof's domain;

     f. Requiring branded hotels to use Red Roof's customer rewards program;

     g. Requiring branded hotels to use Red Roof's property management software;

     h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

     i. Providing IT support for all property management systems, owned, operated, and required by Red Roof;

     j. setting employee wages;

     k. sharing profits;

     l. standardizing training methods for employees;

     m. building and maintaining the facility in a manner specified by the owner;

     n. standardized or strict rules of operation;

     o. regular inspection of the facility and operation by owner; and

     p. fixing prices. [37]

129. Red Roof manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Sharon RRI by Red Roof. [38]

130. Red Roof controls uniform and required reservation, marketing, customer support

---

[37] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

[38] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

systems and loyalty programs at its brand hotels, including the Sharon RRI.[39] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[40]

131.    Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[41]

132.    Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[42] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[43]

133.    Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Sharon

---

[39] *Id.*

[40] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[41] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[42] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[43] *Id.*

34

RRI.[44]

134. In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Sharon RRI.[45]

135. Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[46]

136. Red Roof posts job openings for its branded properties on its central career positing website.[47] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[48]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

137. Plaintiff incorporates each foregoing allegation.

138. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

139. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or

---

[44] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/
[45] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).
[46] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[47] *See* https://www.redroofjobs.com/
[48] *Id.*

should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

140. Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known the trafficking was occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

141. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: January 13, 2023

                                   Respectfully submitted,

                                   */s/ Steven C. Babin, Jr.*
                                   Steven C. Babin, Jr. (0093584)
                                   Jennifer J. El-Kadi (00100660)
                                   Kristina Aiad-Toss (0101336)
                                   **Babin Law, LLC**
                                   65 East State Street, Suite 1300
                                   Cincinnati, Ohio 43215
                                   T: 614-761-8800
                                   E: steven.babin@babinlaws.com /
                                   Jennifer.elkadi@babinlaws.com /
                                   Kristina.aiad-toss@babinlaws.com